# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jeffrey Colin Purdy, | Case No. 22-cv-2821 (JRT/ECW) |
| Plaintiff, | |
| v. | **ORDER AND**<br>**REPORT AND RECOMMENDATION** |
| Michael J. LeJeune,<br>*Warden FCI-Sandstone*, | |
| Respondent. | |

This matter is before the undersigned United States Magistrate Judge on Petitioner Jeffrey Colin Purdy's ("Petitioner" or "Purdy") Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241 ("Petition") (Dkt. 1); Purdy's Emergency Motion for Preliminary Injunction/Affidavit in Support ("Preliminary Injunction Motion") (Dkt. 8); Purdy's Emergency Motion for Temporary Restraining Order/Affidavit in Support ("TRO Motion") (Dkt. 26); and Purdy's Motion to Expand the Record/Affidavit in Support ("Motion to Expand Record") (Dkt. 31). This case has been referred to the undersigned United States Magistrate Judge for decisions on pre-trial matters and to issue a report and recommendation on dispositive motions pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

## I.     PROCEDURAL AND FACTUAL BACKGROUND

Purdy was arrested on February 29, 2020 and charged with one count of Cyberstalking in violation of violation of 18 U.S.C. §§ 2261(b) and 2261A(2). (Dkt. 1-1

at 12[1]; Dkt. 22 ¶ 3.)  He spent most of his pre-trial and pre-sentence detention in

Sherburne County Jail, but spent part of April 2021 and August 2021 at the Federal

Detention Center in Englewood, Colorado ("FDC-Englewood").  (Dkt. 1-1 at 12.)  On

December 14, 2021, Purdy was sentenced in the District of Minnesota to 60 months'

imprisonment with 3 years of supervised release to follow.  (Dkt. 22-1, Resp. Ex. A at 2

(Purdy's Public Information Inmate Data).)  Purdy was committed to the custody of the

Bureau of Prisons ("BOP") at the Federal Correctional Institution in Sandstone,

Minnesota ("FCI-Sandstone") on March 2, 2022.  (*Id*.; *see also* Dkt. 1-1 at 12.)  His

statutory release date via good conduct time ("GCT") is June 2, 2024.  (Dkt. 22-1 at 1;

*see also* Dkt. 38-2 at 1.)

On November 3, 2022, Purdy filed a Petition under 28 U.S.C. § 2241 in this Court

against Respondent Michael J. LeJeune ("the Warden")—the Warden of FCI-Sandstone,

where Purdy was incarcerated at the time the Petition was filed (Dkt. 1 at 1) and, based

on the BOP's Inmate Locator, is incarcerated as of the date of this Order and Report and

Recommendation, *see Find an Inmate*, *available at* https://www.bop.gov/inmateloc/ (last

visited July 14, 2023).  In the Petition, Purdy challenges a "[f]ailure to apply First Step

Act [("FSA")] Time Credits (including removing ability to earn FSA Time Credits

[("FTC")] within 18 months of release)."  (Dkt. 1 at 2.)

Purdy alleges three grounds in the Petition.  Purdy describes Ground One as

"Administrative Remedies Exhausted"; Ground Two as "Due process violation"; and

---

[1]     Unless stated otherwise, references to page citations refer to the CM/ECF
pagination.

Ground Three as "Request to Expedite Briefing/Ruling." (*Id.* at 6-7.) Purdy elaborated on each of those Grounds in an attachment to the Petition. (*See* Dkt. 1-1 at 1-21.) In Ground One, Purdy contends that no relief exists in "the current administrative remedy process," and as such, "administrative remedies are considered exhausted" due to a lack of "authority" from BOP staff to grant the relief sought in the Petition given the unavailability of "administrative remedy procedures for FTCs." (*Id.* at 8-11.) Ground Two asserts that the "BOP is denying Purdy FTC relief Purdy is entitled to under the FSA, in violation of due process." (*Id.* at 12-19.) In Ground Three, Purdy asks the Court to "expedite briefing and its ruling on this Petition." (*Id.* at 20.)

As his requested relief, Purdy asks the Court to order the BOP to: "(1) Give Purdy all of the FTC's [sic] Purdy is to have earned, as described in Ground 2, as of the date this 2241 Petition is ruled on (e.g. Nov[ember] 2022-135 FTCs)"; "(2) Apply the FTC's [sic] granted in (1) to Purdy's early release"; "(3) Put Purdy in for the appropriate RRC [residential reentry center]/HC [home confinement][2] time based off the presumptive RRC/HC from presumptive FTCs under the FSA, in addition to Purdy's Second Chance Act RRC/HC (minimum 6 months)" where "[t]he date should be on or around Dec[ember] 3, 2022"; and "(4) Grant any relief the Court deems appropriate if not already stated." (*Id.* at 21.)

On December 9, 2022, the Court ordered the Warden to answer the Petition and provided Purdy with the opportunity to file a reply to the answer. (Dkt. 7 ¶¶ 1-3.) The

---

[2]     Given the attachment to the Petition, the Court understands "RRC" to mean a residential reentry center and "HC" to mean home confinement. (*See generally* Dkt. 1-1.)

Court also granted "Purdy's request for an expedited briefing and ruling (*see, e.g.*, Dkt. 1-1 at 20 [Ground Three]) . . . to the extent it is consistent with the above briefing schedule, and otherwise denied" his request.[3]  (*Id.* ¶¶ 3-4 (capitalization amended).)

On December 14, 2022, Purdy filed the Preliminary Injunction Motion, along with supporting exhibits, seeking transfer to a "halfway house" (which the Court understands means an RRC or similar facility) for the remainder of his sentence.  (Dkts. 8, 9.)  The Court issued a briefing order on December 16, 2022, ordering the Warden to respond to the Preliminary Injunction Motion by January 4, 2023.  (Dkt. 12.)  On December 22, 2022, the Court granted the Warden's request to consolidate the briefing schedules in this case, allowing the Warden to file a combined answer to the Petition and response to the Preliminary Injunction Motion by January 4, 2023.  (Dkts. 13, 16.)  The Warden then sought an additional extension until January 13, 2023 because the BOP was reconfiguring its "automatic time credit calculation program" to implement changes made by Program Statement 5410.01, *First Step Act of 2018 – Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4)*, and the resulting update was expected to take place the weekend of January 7-8, 2023.  (Dkt. 17 ¶ 4.)  The Warden asserted this would allow the BOP to submit "a declaration with the updated information necessary to provide the Court with an accurate and appropriate response to the petition and motion."  (*Id.*)  The Court granted the Warden's request for an extension of time to January 13,

---

[3]      The Court therefore does not further address Ground Three in this Order and Report and Recommendation.

2023 to file his consolidated response, noting no further extensions would be allowed absent any extraordinary circumstances.  (Dkt. 20.)

On January 13, 2023, the Warden filed a consolidated Response to the Petition and Preliminary Injunction Motion, along with the Declaration of Matthew Apple, a Unit Manager at FCI-Sandstone ("First Apple Declaration").  (Dkts. 21, 22.)  Purdy filed a Reply to the Response on February 8, 2023, along with supporting exhibits.  (Dkts. 24, 25.)  Purdy also filed the TRO Motion on February 8, 2023, as well as a supporting affidavit and exhibits.  (Dkts. 26-28.)  Purdy asserts in the TRO Motion that the BOP is improperly denying him FTCs, claims the BOP failed to transfer him to an RRC "in violation of due process of the law," and asks for transfer to a RRC "while the [C]ourt waits to conduct a[n] evidentiary hearing, or grant" the Preliminary Injunction Motion. (Dkt. 26 at 1-3.)  On March 3, 2023, the Court ordered the Warden to respond to the TRO Motion by March 17, 2023 and gave Purdy the opportunity to file a reply within 14 days from the time the Warden served the response on him.  (Dkt. 30.)

On March 13, 2023, Purdy filed the Motion to Expand Record to include an affidavit attached to the Motion asserting that "Administrative remedies not being available at FCI-Sandstone," BOP staff had engaged in certain retaliatory acts against Purdy for filing the Petition, and identifying "other concerns."  (Dkt. 31; *see also* Dkt. 32.)

On March 20, 2023, the Court granted the Warden's request for an extension of time to respond to the TRO Motion.  (Dkts. 33, 35.)  On March 20, 2023, Respondent filed an Opposition to Emergency Motion for Temporary Restraining Order ("Response

to TRO Motion"), along with another declaration from Unit Manager Apple ("Second Apple Declaration").  (Dkts. 37, 38.)  On April 6, 2023, Purdy filed a reply to the Response to TRO Motion, along with supporting documents.  (Dkts. 40-43.)

## II.    LEGAL STANDARD

### A.    28 U.S.C. § 2241

For relief to be granted under 28 U.S.C. § 2241, Purdy must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3).  It is well-settled that "[a] necessary predicate for the granting of federal habeas relief [to a petitioner] is a determination by the federal court that [his or her] custody violates the Constitution, laws, or treaties of the United States."  *Rose v. Hodges*, 423 U.S. 19, 21 (1975) (citing 28 U.S.C. § 2241).

### B.    FSA Requirements

The FSA was signed into law on December 21, 2018, and provides, among other things that "[n]ot later than 210 days after the date of enactment of this subchapter, the Attorney General . . . shall develop and release publicly on the Department of Justice website a risk and needs assessment system" to be used to "determine the recidivism risk of each prisoner . . . and classify each prisoner as having minimum, low, medium, or high risk for recidivism."  18 U.S.C. § 3632(a)(1).  On July 19, 2019, the Attorney General publicly released a risk and needs assessment system, stating the development of the Prisoner Assessment Tool Targeting Estimated Risks and Needs ("PATTERN"), which was updated in January 2020.  *See The First Step Act of 2018: Risk and Needs Assessment System*, U.S. Dep't of Justice Office of the Attorney Gen. (July 19, 2019),

6

www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system.pdf; *see also The First Step Act of 2018: Risk and Needs Assessment System - UPDATE*, U.S. Dep't of Justice Office of the Attorney Gen. (January 2020), www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf.

According to the FSA, the BOP then had 180 days from July 19, 2019 to "implement and complete" the PATTERN assessment for each prisoner. *See* 18 U.S.C. § 3621(h)(1)(A); *see also Manning v. Kallis*, No. 21-cv-160 (JRT/KMM), 2021 WL 4526653, at *1 (D. Minn. Sept. 9, 2021) ("The First Step Act next establishes January 15, 2020 as the deadline for the BOP to implement and complete the initial PATTERN assessment for each prisoner") (citing 18 U.S.C. § 3621(h)(1)).  The BOP was to provide opportunities for prisoners to participate in evidence-based recidivism reduction programs ("EBRR")[4] programs and productive activities ("PAs")[5] and "provide incentives and rewards for prisoners" who complete those programs and activities, including "increased phone privileges, additional visitation time, transfer to prisons closer to prisoners' residence upon release, and, for prisoners who complete EB[R]R programs,

---

[4]     "An EBRR Program is a group or individual activity that has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism; and is designed to help prisoners succeed in their communities upon release from prison." 28 C.F.R. § 523.41(a).

[5]     "A PA is a group or individual activity that allows an inmate to remain productive and thereby maintain or work toward achieving a minimum or low risk of recidivating." 28 C.F.R. § 523.41(b).

'time credits.'" *Manning*, 2021 WL 4526653, at *1 (citing 18 U.S.C. §§ 3632(d)(1), (d)(2), (d)(4)).

The BOP then had two years from the January 15, 2020 date, or until January 15, 2022, to "phase in" the EBRR programs and PAs for each prisoner.  18 U.S.C. § 3621(h)(2)(A); *see also Depoister v. Birkholz*, No. 21-cv-684 (ECT/BRT), 2021 WL 3492295, at *2 (D. Minn. Aug. 9, 2021).  During the 2-year phase-in period, the BOP's "priority for such programs and activities shall be accorded based on a prisoner's proximity to release date" and the BOP may begin to expand any EBRR programs and PAs that exist at a prison and "**may** offer to prisoners who successfully participate in such programs and activities the incentives and rewards described in subchapter D."  18 U.S.C. §§ 3621(h)(3), (h)(4) (emphasis added).

An eligible inmate "may" earn FTCs "for programming and activities in which he or she participated from December 21, 2018, until January 14, 2020."  28 C.F.R. § 523.42(b)(2).  According to the BOP:

> [F]or inmate participation in programming during this period of time, the Bureau will exercise its discretion to award FSA Time Credits to inmates otherwise deemed eligible under the First Step Act by applying the same criteria as that applied to inmate participation in authorized EBRR programs or PAs recommended based on a risk and needs assessment after January 2020 to determine the inmate's retroactive Time Credit balance.  Eligible inmates will be afforded a presumption of participation for the period between December 21, 2018, and January 14, 2020 and be awarded Time Credits accordingly.

*See FSA Time Credits A Rule by the Prisons Bureau on 01/19/2022*, Federal Register, The Daily Journal of the United States Government,

https://www.federalregister.gov/documents/2022/01/19/2022-00918/fsa-time-credits (last visited July 14, 2023).

Eligible prisoners that "successfully complete[] evidence-based recidivism reduction programming or productive activities" "shall earn 10 days of time credits for every 30 days of successful participation" in such programs or activities, and a prisoner that is determined by the BOP to be "at a minimum or low risk for recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation . . ." 18 U.S.C § 3632 (d)(4)(A)(i)(ii). "'Successful participation' requires a determination by Bureau staff that an eligible inmate has participated in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, and has complied with the requirements of each particular EBRR Program or PA." 28 C.F.R. § 523.41(c)(2).

FTCs for inmates that successfully participate in EBRR programs or PAs "shall be applied toward time in prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). Prelease custody includes being placed in either home confinement or a residential reentry center. 18 U.S.C. § 3624(g)(2)(A)(B). An inmate may lose FTCs "for violation of the requirements or rules of an EBRR Program or PA" and the inmate may appeal that loss "through the Bureau's Administrative Remedy Program." 28 C.F.R. § 523.43(a)(b).

An inmate that is eligible to apply his FTCs is someone who:

(A) has earned time credits under the risk and needs assessment system developed under subchapter D (referred to in this subsection as the "System") in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment;

(B) has shown through the periodic risk reassessments a demonstrated recidivism risk reduction or has maintained a minimum or low recidivism risk, during the prisoner's term of imprisonment;

(C) has had the remainder of the prisoner's imposed term of imprisonment computed under applicable law; and

(D) (i) in the case of a prisoner being placed in prerelease custody, the prisoner—

> (I) has been determined under the System to be a minimum or low risk to recidivate pursuant to the last 2 reassessments of the prisoner; or

> (II) has had a petition to be transferred to prerelease custody or supervised release approved by the warden of the prison, after the warden's determination that--

>> (aa) the prisoner would not be a danger to society if transferred to prerelease custody or supervised release;

>> (bb) the prisoner has made a good faith effort to lower their recidivism risk through participation in recidivism reduction programs or productive activities; and

>> (cc) the prisoner is unlikely to recidivate; or

(ii) in the case of a prisoner being placed in supervised release, the prisoner has been determined under the System to be a minimum or low risk to recidivate pursuant to the last reassessment of the prisoner.

18 U.S.C. § 3624(g)(1).

## III.   DISCUSSION

### A.   Motion to Expand Record

On March 13, 2023, Purdy filed the Motion to Expand Record to include an affidavit attached to the Motion asserting that "Administrative remedies not being available at FCI-Sandstone," BOP staff had engaged in certain retaliatory acts against Purdy for filing the Petition, and identifying "other concerns."  (Dkt. 31; *see also* Dkt. 32.)  The Warden did not oppose the Motion to Expand Record.  The Court grants the Motion to Expand Record and has considered the materials submitted by Purdy with that Motion in connection with this Order and Report and Recommendation.

### B.   Petition: Ground One

#### 1.   The Parties' Arguments

As stated previously, in Ground One, Purdy contends that "administrative remedies are considered exhausted" due to a lack of "authority" from the BOP to grant the relief sought in the Petition given the unavailability of "administrative remedy procedures for FTCs."  (Dkt. 1-1 at 8-11.)  The Warden did not respond to Purdy's contentions in Ground One.  (*See* Dkts. 21, 37.)  In the Reply, Purdy contends that because the Warden failed to respond to this issue, "the Respondent can be considered to have waived the issue and conceded that the [a]dministrative [r]emedies were exhausted." (Dkt. 24 at 10.)

#### 2.   Analysis

The Court construes Ground One as an assertion that the Court should waive the exhaustion requirement.  (*See* Dkt. 1-1 at 11 (stating that "the administrative remedy

11

process is unavailable for the reasons listed in this ground . . . in relation to FTC relief
and therefore are exhausted" and "even if administrative remedies were available they
would be a futile attempt . . .").)  Generally, all federal prisoners must exhaust all
available administrative remedies prior to seeking federal habeas corpus relief
under 28 U.S.C. § 2241.  *See United States v. Wilson*, 503 U.S. 329, 335 (1992); *see
also Mathena v. United States*, 577 F.3d 943, 946 (8th Cir. 2009).  However, because the
concept of exhaustion for § 2241 petitions is judicially created and not mandated by
statute, "sound judicial discretion governs."  *McCarthy v. Madigan*, 503 U.S. 140, 144
(1992) (citations omitted); *see also Lueth v. Beach*, 498 F.3d 795, 797 n.3 (8th Cir. 2007)
(holding that failure to exhaust does not affect a court's ability to decide cases where "the
exhaustion prerequisite for filing a 28 U.S.C. § 2241 petition is judicially created, not
jurisdictional").

In determining whether to exercise its discretion, the Court "balance[s] the interest
of the individual in retaining prompt access to a federal forum against countervailing
institutional interests favoring exhaustion."  *McCarthy*, 503 U.S. at 146.  The exhaustion
requirement may be excused where proceeding through the administrative remedy
process would undoubtedly be an exercise in futility that could serve no useful
purpose.  *See Elwood v. Jeter*, 386 F.3d 842, 844 n.1 (8th Cir. 2004) (exhaustion
requirement waived based on government's concession that "continued use of the
[administrative] grievance procedure to contest the validity of the BOP's new policy
would be futile").

Here, Purdy contends that no administrative remedies existed for FTCs at the time he filed the Petition and that "even if administrative remedies were available[,] they would be a futile attempt." (*See* Dkt. 1-1 at 11.) Absent any argument from the Warden, and based on the record, the Court finds that the balance of interests favors having the issues raised in Ground Two promptly decided over the institutional interests protected by the exhaustion requirement. *See Jones v. Fikes*, Case No. 20-cv-1341 (SRN/HB), 2020 WL 8513799, at *4 (D. Minn. Nov. 2, 2020) (stating that it "is Respondent's burden to establish lack of exhaustion" and recommending that the exhaustion requirement be waived where "Respondent did not specifically address or rebut [the petitioner's] assertion or documentation"). The Court therefore recommends that the exhaustion requirement be waived in this case, and as such, discusses the merits of the claims presented in Ground Two.

## C.      Petition: Ground Two

In Ground Two, Purdy asserts that the "BOP is denying Purdy FTC relief Purdy is entitled to under the FSA, in violation of due process." (Dkt. 1-1 at 12-19.) Purdy originally sought the following relief: "(1) Give Purdy all of the FTCs Purdy is to have earned, as described in Ground 2, as of the date this 2241 Petition is ruled on (e.g. Nov[ember] 2022-135 FTCs)"; "(2) Apply the FTCs granted in (1) to Purdy's early release"; "(3) Put Purdy in for the appropriate RRC/HC time based off the presumptive RRC/HC from presumptive FTCs under the FSA, in addition to Purdy's Second Chance Act RRC/HC (minimum 6 months)," arguing that "[t]he date should be on or around

Dec[ember] 3, 2022"; and "(4) Grant any relief the Court deems appropriate if not already stated." (*Id.* at 21.) The Court discusses Ground Two below.

## 1.    Evidentiary Issues

In his Reply, Purdy argued that the First Apple Declaration does "not lay the foundation for various topics and contains material omissions." (Dkt. 24 at 13.) Because the Court's analysis of Ground Two involves the First Apple Declaration and attached Exhibits, the Court begins with this issue.

"The Federal Rules of Evidence are applicable to habeas proceedings." *Stojkowski v. Fisher*, Civ. No. 10-2390 (PJS/LIB), 2011 WL 1831680, at *3 (D. Minn. April 18, 2011) (citing Fed. R. Ev. 1101(e)). To the extent Purdy challenges whether Apple can authenticate the Exhibits attached to the First Apple Declaration, "the requirement of authenticating or identifying an item of evidence" is satisfied by "evidence sufficient to support a finding that the item is what its proponent claims it is.'" Fed. R. Evid. 901(a); *see also Felix v. Rios*, Civil No. 08-4925 (PAM/RLE), 2009 WL 2958001, at *3 (D. Minn. Sept. 10, 2009) ("Rule 901 mandates only that the authentication requirement as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. . . . The Rule then notes that the '[t]estimony of [a] witness with knowledge suffices.") (cleaned up). "Where a witness authenticates a document as accurate, and the record establishes the witness's qualification to authenticate the document, the district court does not abuse its discretion in finding that the authentication is reliable and the document is authentic." *Stojkowski*, 2011 WL 1831680, at *3 (citing *United States v. Two Elk*, 536 F.3d 890, 905 (8th Cir.

2008); *United States v. Coohey*, 11 F.3d 97, 99 (8th Cir. 1993) ("to meet the

authentication standard 'the proponent need only demonstrate a rational basis for its

claim that the evidence is what the proponent asserts it to be')").

Apple attested as follows in the First Apple Declaration:

I am currently employed by the Federal Bureau of Prisons (BOP) of the United States Department of Justice, as a Unit Manager at the Federal Correctional Institution in Sandstone, Minnesota (FCI Sandstone). I began working for the BOP in March of 2009, became a Case Manager in September of 2012, and became a Unit Manager in December of 2022. As part of my official duties, I am familiar with the time credit provisions of the First Step Act and the Bureau's policies and procedures implementing the provisions. I have access to BOP files maintained in the ordinary course of business related to inmates incarcerated within the BOP.

(Dkt. 22 ¶ 1.)

Apple further attested that the Exhibits attached to the First Apple Declaration are

"true and correct" copies.  (*See generally id.*)  As such, the Court finds that the

documents attached to the First Apple Declaration are properly authenticated.[6]  *See*

*Stojkowski*, 2011 WL 1831680, at *3 (finding declarant was qualified to attest to the

authenticity of BOP records and demonstrated that the documents attached to her

declaration were what they claimed to be where the declarant attested to her employment

by the BOP, her access to relevant records, identified her duties, and certified that the

attachments were true and correct copies).  To the extent Purdy makes other

"foundational" arguments as to the First Apple Declaration (*see* Dkt. 24 at 13), such

---

[6]     Purdy did not challenge the documents' admissibility.  In any event, courts have found such BOP records admissible under the business records exception.  *See e.g.*, *Felix*, 2009 WL 2958001, at *4 (collecting cases).

arguments either exceed the scope of the relief sought in his Petition, are directed to the substance of Purdy's claims and addressed elsewhere in this Order and Report and Recommendation, or otherwise lack merit.

### 2. Disallowance of Earned FTCs

#### a. The Parties' Arguments

Purdy asserts that he is eligible to earn and apply time credits under the FSA. (Dkt. 1-1 at 13.)  In his Petition and supporting documents, filed in November 2022, Purdy contends that he has taken all required surveys to earn FTCs; that he has been assessed with certain needs areas; and that "living skills and program participation" were "t[aken] away" due to him being improperly found in violation of "a 310 ([b]eing absent from assignment)" incident which resulted in him being assessed with a "cognition" need.  (*Id.* at 12-15.)  Purdy also asserts that he was improperly found in violation of a "307 ([r]efusing to obey an order)" incident and that the "307" and "310" incidents did not cause his PATTERN score to go above a Low.  (*Id.* at 15-18.)  According to Purdy, he has been "successfully participating" in the needs areas that have been assessed to him given that he is on the waiting list for participating in various programs and has not declined any programs.  (*Id.*)

Purdy asserts that FTCs that he earned were "taken away" without prior notice. (*Id.* at 19.)  Specifically, Purdy contends that he was improperly disallowed FTCs and placed in "opt out" status for the time he spent in the special housing unit ("SHU"), for having incomplete needs assessments, and due to being placed in refuse status for the residential drug abuse program ("RDAP").  (*Id.* at 16-19.)

In the Response filed on January 13, 2023, the Warden contends that a "nationwide recalculation of time credits was initiated beginning on January 6, 2023" and that Purdy's FSA Time Credit Assessment now reflects that he has not been disallowed time credits due to his time in the SHU, incomplete needs assessments, or refusing to participate in the RDAP.  (Dkt. 21 at 11-13, 11 n. 3 (citing Apple Decl. ¶ 10; Ex. F).)  The Warden argues that as such, Purdy's claims regarding the BOP not affording him FTCs or placing him in "opt-out" status due to the time he spent in the SHU, incomplete needs assessments, and his RDAP status are moot.  (*Id.* at 11-13.)

  **b.**  **Analysis**

"Article III of the United States Constitution limits the jurisdiction of the federal courts to actual, ongoing cases and controversies."  *Ali v. Cangemi*, 419 F.3d 722, 723 (8th Cir. 2005) (quoting *Haden v. Pelofsky*, 212 F.3d 466, 469 (8th Cir. 2000), citing U.S. Const. art. III, § 2, cl. 1).  "When, during the course of litigation, the issues presented in a case 'lose their life because of the passage of time or a change in circumstances . . . and a federal court can no longer grant effective relief,' the case is considered moot."  *Id.* (quoting *Haden*, 212 F.3d at 469).  When a case becomes moot, a federal court cannot "address the merits because any opinion [the court] would issue would be merely advisory."  *In re Search Warrants Issued in Connection with Investigation of S. Cent. Career Ctr., W. Plains, Mo.* ("*In re Search Warrants*"), 487 F.3d 1190, 1192 (8th Cir. 2007) (citing *Haden*, 212 F.3d at 469).

In the November 3, 2022 Petition, Purdy specifically challenged the loss of 45 FTCs (Dkt. 1-1 at 10; Dkt. 1-2, Pet.'s Ex. C at 19 ("SENTENCE MONITORING

COMPUTATION DATA AS OF 09-07-2022" including 45 FTCs); Dkt. 1-2, Pet.'s Ex. D at 20 ("SENTENCE MONITORING COMPUTATION DATA AS OF 10-17-2022" showing a home detention eligibility date of December 4, 2023, which Purdy interprets as showing his "FSA removed").)  However, after the January 7-8, 2023 autocalculation, the January 10, 2023 and February 11, 2023 FSA Time Credit Assessment show no post-commitment disallowed program days/FTCs.  (Dkt. 38-1, Resp. Ex. A at 1; *see also* Dkt. 22-7, Resp. Ex. G at 1; Dkt. 42-1, Pet. Ex. A at 1 (Purdy's FSA Time Credit Assessment dated March 25, 2023 showing no programs days are disallowed)).  In other words, the autocalculation appears to have resolved Purdy's challenges based on disallowed program days/FTCs.

Purdy asserts in the Reply that "the 'opt-out' status issues cured by the January 1st, 2023, autocalculation update were not primary injury [sic] or the cause of the primary injury Purdy raised" and that "these [sic] curing of the 'opt-out' status issues does [sic] not survive the mootness doctrine" even though he admits that the "autocalculation update fixed the 'opt-out' status issues/situations."  (Dkt. 24 at 1, 5, 13-14.)  Absent any evidence showing that the BOP is disallowing Purdy's FSA program days/FTCs due to time spent in the SHU, incomplete needs assessments, or being placed in RDAP refuse status, this aspect of Ground Two is moot because Purdy no longer has a concrete, redressable injury.  *See Ali*, 419 F.3d at 723; *see also In re Search Warrants*, 487 F.3d at 1192.

That said, a court should not dismiss a habeas petition as moot if any of the following exceptions apply:

> (1) secondary or 'collateral' injuries survive after resolution of the primary injury; (2) the issue is deemed a wrong capable of repetition yet evading review; (3) the defendant voluntarily ceases an allegedly illegal practice but is free to resume it at any time; or (4) it is a properly certified class action suit.

*Ahmed*, 2017 WL 3267738, at *2 (quoting *Riley v. I.N.S.*, 310 F.3d 1253, 1257 (10th Cir. 2002)), *R.&R. adopted*, 2017 WL 3268176 (D. Minn. July 31, 2017).

While Purdy initially asserts in the Reply that the "autocalculation update fixed the 'opt-out' status issues/situations," he also contends that the "issues with the autocalculation are wrongs capable of repetition yet evading review." (Dkt. 24 at 13.)

The exception of "a wrong capable of repetition yet evading review," "applies if the matter is too short in duration to be fully litigated before it ends or expires and there is a reasonable expectation that [Petitioner] will be subjected to the same action again." *In re Search Warrants*, 487 F.3d at 1193. The record shows that Purdy's FSA program days/FTCs are no longer disallowed and there is nothing to suggest that the BOP would change its course in that regard. (*See generally*, Dkt. 22-4, Resp. Ex. D (BOP Program Statement 5410.01 dated November 18, 2022 describing the BOP's procedures for implementing the FSA).) Accordingly, it appears there is nothing further to litigate. *Ahmed*, 2017 WL 3267738, at *3 ("Because there is nothing further to litigate in Petitioner's case, [this] situation does not apply."). In any event, Purdy would have the ability to bring a new habeas petition under a new set of facts and circumstances should he believe he has been improperly disallowed additional FSA program days/FTCs. *See Taylor v. Fikes*, Case No. 22-cv-1364 (PJS/ECW), 2022 WL 18584395, at *10 (D. Minn. Dec. 2, 2022) (recommending in the context of GCT credits that the petition be dismissed

as moot and finding that none of the mootness exceptions applied, noting petitioner had the "ability to bring a new habeas petition . . . under a new set of facts and circumstances should he believe a re-calculation . . . of his GCT is required"), *R. & R. adopted*, 2023 WL 1477839, at *1 (D. Minn. Feb. 2, 2023).  Therefore, this exception to the mootness doctrine does not apply.

Nor do any of the other exceptions apply as Purdy has not identified any cognizable collateral consequences arising from his allegation that the BOP disallowed his FTCs.  With respect to the third exception, there is nothing on the record to suggest that Respondent "voluntarily cease[d] an allegedly illegal practice" that it will resume "at any time."  Finally, the Petition was brought on behalf of an individual Petitioner, not on behalf of a class of individuals, so the fourth exception also does not apply.  (*See* Dkt. 1.) Accordingly, the Court recommends denial of Ground Two as moot to the extent it alleges that the BOP disallowed FSA program days or FTCs due to Purdy's time in the SHU, incomplete needs assessments, or being placed in RDAP refuse status.

### 3.     Rate at Which Purdy Should Be Earning FTCs

#### a.     The Parties' Arguments

Purdy asserts that he should have been earning FTCs at the rate of 15 days for every 30 days of programming, apparently beginning as soon as he entered FCI-Sandstone on March 2, 2022, which he claims in the Petition would result in an early release date of March 4, 2024.  (Dkt. 1-1 at 19.)  Purdy claims that he took his required

needs surveys electronically while at FDC-Englewood between April and July 2022[7] and retook them on paper when he arrived at FCI-Sandstone in March 2022. (*Id.* at 13.) Purdy further contends that he has been successfully participating in his FSA programming since he arrived on March 2, 2022 and has been "at most [a] Low" PATTERN risk assessment during his entire imprisonment. (*Id.*) Purdy argues that when all of this is considered, he was entitled to "at least 120 FTCs (March 2, 2022 – Oct[ober] 29, 2022; 830 day periods)" when he filed the Petition. (*Id.* at 18.)

The Warden does not dispute Purdy's PATTERN risk scores or successful participation since March 2, 2022, but disagrees that Purdy was eligible for the 15-day rate as of his commitment date. (*See* Dkts. 21, 37.) Instead, the Warden argues in his January 13, 2023 filing that to begin earning an additional 5 days of FTCs (in increase from 10 to 15 days) for every 30 days of programming, the FSA requires that an inmate have his/her PATTERN score "calculated on three occasions – one 'determination' and two 'reassessments.'" (Dkt. 21 at 16-18.) The Warden contends that 18 U.S.C. § 3632(d)(4)(A)(ii) requires inmates to have their recidivism risks "determined" as a minimum or low as part of the intake process and then maintain such recidivism risks during the next 2 assessments for them to receive 15 days of FTCs per 30 days of programming. (*Id.* at 16-17.) The Warden contends that "determination of a low or minimum PATTERN score for the first time is established by the language 'determined by the Bureau of Prisons to be at a minimum or low risk for recidivating.'" (*Id.* at 16.)

---

[7]     The April 2022 date appears to be an error, as Purdy earlier states he took the surveys in 2021. (Dkt. 1-1 at 12.)

The Warden makes a statutory interpretation argument that the "use of the word 'over' to modify the phrase '2 consecutive assessments' indicates a duration of time equal to '2 consecutive assessments'" and that the "phrase '2 consecutive assessments,' read in conjunction with § 3632(d)(5), means one assessment up to one year after the first determination, followed by a second assessment, again, up to one year after the second determination, for a combined total of up to two years after the first determination." (*Id.* at 16-17.)

> The Warden further asserts:
>
> Consistent with this language in the FSA, the Bureau has established that inmates will receive an initial PATTERN score upon their arrival, ordinarily within 28 days, at their designated facility for service of their sentence. *See* Apple Decl. Ex. D, at 8. Reassessments will be conducted at inmates' "regularly scheduled Program Review." *Id.* at 9. According to Program Statement 5322.13, *Inmate Classification and Program Review*, the timing of Program Reviews depends on the time remaining in an inmate's sentence: at least once every 180 days, and when the inmate is within 12 months of their projected release date, every 90 days. *See* Apple Decl. Ex. E at 5.

(*Id.* at 17.)

As to Purdy, the Warden states that he "was initially assessed to be a Low PATTERN score in March of 2022" but he "has not yet had his second reassessment, and therefore, remains at an earning rate of 10 days for 30 days of programming." (*Id.*) The Warden argues for dismissal of the Petition on this basis. (*Id.* at 18.)

In the Reply, Purdy contends that he "had '2 consecutive reviews' at a low recidivism, as of May 2022 and [he] should be earning 15 FTC's [sic] per 30[-]day period under the new process released November 18th, 2022." (Dkt. 24 at 1.) Purdy challenges the manner in which the BOP interprets the FSA's "2 consecutive assessments"

requirement.  (*Id.* at 11.)  Purdy also asserts that he had "undergone 3 consecutive recidivism reviews (March 2022, May 2022, and September 2022)" and that the "week of January 9th, 2023," he was "again reassessed for a low recidivism minimally his 4th consecutive review at a low."  (*Id.* at 4-5, 11-12.)  Purdy contends that after the "BOP's [January 7-8, 2023] autocalculation had been ran," several inmates' FTC earning rates were not appropriately reflected as inmates that had maintained Low PATTERN scores for several assessment periods were showing as earning FTCs at a rate of 10 days per 30 days of programming, instead of 15 days.  (*Id.* at 5.)

In the Response to TRO Motion, the Warden contends that Purdy "received his initial PATTERN determination as a low risk on March 2, 2022" upon arriving at FCI-Sandstone.  (Dkt. 37 at 11.)  The Warden further asserts that Purdy's "first reassessment, where he remained a Low, occurred on August 29, 2022" and that "Purdy will not begin to accrue FTCs at the 15-day rate until his next reassessment, providing his PATTERN score remains at a Low," noting that "the automated FSA Time Credit Assessment for the month of March 2023 has not been issued."  (*Id.* at 11.)  Further, "[i]f [Purdy] receives a second reassessment with a low PATTERN score, he would earn FTCs at the 15-day rate, from the date of that reassessment."  (*Id.* at 11 n.2.)

> **b.    Analysis**

The Court has had some difficulty analyzing this issue, not just because Purdy's FTCs and earning rate have changed during this action's pendency, but also because certain BOP records appear to be inconsistent with other BOP records and the Warden's assertions in his filings.  To begin, on January 13, 2023, the Warden stated that Purdy

was initially assessed with a Low PATTERN score in March 2022 and had "not yet had his second reassessment." (*See* Dkt. 21 at 18; Dkt. 22 ¶ 5.) The Warden relied on Exhibit B to the First Apple Declaration to support this statement. (*See* Dkt. 21 at 18 (citing Dkt. 22-2, Resp. Ex. B).) Exhibit B is a single-page document titled "INMATE HISTORY FIRST STEP" and dated January 10, 2023, the relevant portions of which are reproduced below:

```
FCL   ASSIGNMENT DESCRIPTION                     START DATE/TIME  STOP  DATE/TIME
SST   FTC ELIG   FTC-ELIGIBLE - REVIEWED         03-16-2022 1100  CURRENT
SST   N-ANGER N  NEED - ANGER/HOSTILITY NO       08-25-2022 0624  CURRENT
SST   N-ANTISO N NEED - ANTISOCIAL PEERS NO      08-25-2022 0624  CURRENT
SST   N-COGNTV Y NEED - COGNITIONS YES           08-25-2022 0624  CURRENT
SST   N-DYSLEX N NEED - DYSLEXIA NO              04-01-2022 1356  CURRENT
SST   N-EDUC N   NEED - EDUCATION NO             08-25-2022 0624  CURRENT
SST   N-FIN PV Y NEED - FINANCE/POVERTY YES      08-25-2022 0624  CURRENT
SST   N-FM/PAR Y NEED - FAMILY/PARENTING YES     08-25-2022 0624  CURRENT
SST   N-M HLTH N NEED - MENTAL HEALTH NO         08-25-2022 0624  CURRENT
SST   N-MEDICL N NEED - MEDICAL NO               08-25-2022 0624  CURRENT
SST   N-RLF N    NEED - REC/LEISURE/FITNESS NO   08-25-2022 0624  CURRENT
SST   N-SUB AB Y NEED - SUBSTANCE ABUSE YES      08-25-2022 0624  CURRENT
SST   N-TRAUMA N NEED - TRAUMA NO                08-25-2022 0624  CURRENT
SST   N-WORK Y   NEED - WORK YES                 08-25-2022 0624  CURRENT
SST   R-LW       LOW RISK RECIDIVISM LEVEL       05-03-2022 1017  CURRENT
SST   N-TRAUMA N NEED - TRAUMA NO                05-03-2022 1017  08-25-2022 0624
SST   N-SUB AB Y NEED - SUBSTANCE ABUSE YES      05-03-2022 1017  08-25-2022 0624
SST   N-RLF N    NEED - REC/LEISURE/FITNESS NO   05-03-2022 1017  08-25-2022 0624
SST   N-M HLTH N NEED - MENTAL HEALTH NO         05-03-2022 1017  08-25-2022 0624
SST   N-MEDICL N NEED - MEDICAL NO               05-03-2022 1017  08-25-2022 0624
SST   N-FIN PV Y NEED - FINANCE/POVERTY YES      05-03-2022 1017  08-25-2022 0624
SST   N-FM/PAR Y NEED - FAMILY/PARENTING YES     05-03-2022 1017  08-25-2022 0624
SST   N-EDUC N   NEED - EDUCATION NO             05-03-2022 1017  08-25-2022 0624
SST   N-ANTISO N NEED - ANTISOCIAL PEERS NO      05-03-2022 1017  08-25-2022 0624
SST   N-ANGER N  NEED - ANGER/HOSTILITY NO       05-03-2022 1017  08-25-2022 0624
SST   N-WORK N   NEED - WORK NO                  05-03-2022 1017  08-25-2022 0624
SST   N-COGNTV N NEED - COGNITIONS NO            05-03-2022 1017  08-25-2022 0624
SST   R-LW       LOW RISK RECIDIVISM LEVEL       03-16-2022 0819  05-03-2022 1017
SST   N-WORK N   NEED - WORK NO                  03-17-2022 1131  05-03-2022 1017
```

(Dkt. 22-2, Resp. Ex. B (highlighting added).)

Exhibit B indicates that Purdy was "FTC-Eligible" as of March 16, 2022 and also contains a line indicating Purdy's "ASSIGNMENT" was "R-LW" with a "DESCRIPTION" of "LOW RISK RECIDIVISM LEVEL" having a "START DATE/TIME" as of March 16, 2022 and a "STOP DATE/TIME" of May 3, 2022. (*Id.*) The same document contains a line indicating Purdy's "ASSIGNMENT" was "R-LW"

with a "DESCRIPTION" of "LOW RISK RECIDIVISM LEVEL" having a "START

DATE/TIME" of May 3, 2022 with a "STOP DATE/TIME" of "CURRENT."  (*Id.*)

From this document, the Court concludes that Purdy was initially assessed and given a

PATTERN score of Low on March 16, 2022.  This appears consistent with BOP Program

Statement 5410.01, which states that inmates ordinarily receive their initial PATTERN

scores within 28 days of arrival at their designated sentencing facilities.  (*See* Dkt. 22-4,

Resp. Ex. D at 8; *see also* Dkt. 37 at 11 (The Warden stating: "Consistent with the FSA,

the BOP has established that inmates will ordinarily receive an initial PATTERN score

within 28 days of arrival at their designated facility for service of their sentence.").)

The Court also concludes from Exhibit B that Purdy was assessed again and given

a PATTERN score of Low on May 3, 2022, and that the May 3, 2022 PATTERN score

was deemed current as of Exhibit B's January 10, 2023 print date.  The Warden did not

mention the May 3, 2022 PATTERN risk assessment in his Response, although it is

somewhat implied when he stated that Purdy's "second reassessment" had not yet

occurred.

Then, on March 20, 2023, the Warden's Response to TRO Motion states:

[Purdy] received his initial PATTERN determination as a Low risk on March
2, 2022. *See* Apple II Decl. Ex. A.  His first reassessment, where he remained
a Low, occurred on August 29, 2022. *See id.* Purdy will not begin to accrue
FTCs at the 15-day rate until his next reassessment, providing his PATTERN
score remains at a Low.

(Dkt. 37 at 11.)

25

The Warden cited Exhibit A to the Second Apple Declaration, which is titled FSA
Time Credit Assessment and dated February 11, 2023, to support these statements.  (*See*
*id.*)  But Exhibit A indicates as follows:

```
Start        Stop          Pgm Status   Pgm Days
03-02-2022   02-11-2023    accrue       346
  Accrued Pgm Days...: 346
  Carry Over Pgm Days: 0
  Time Credit Factor.: 10
  Time Credits.......: 110
--------------------------------------------------------------------------------
#   Start      Stop       Status      Risk Assignment   Risk Asn Start      Factor
001 03-02-2022 08-29-2022 ACTUAL      FSA R-LW          05-03-2022 1117     10
002 08-29-2022 02-25-2023 ACTUAL      FSA R-LW          05-03-2022 1117     10
```

(Dkt. 38-1, Resp. Ex. A at 1 (highlighting added).)

Two things concern the Court regarding the Warden's Response to TRO Motion.
First, Purdy's March 16, 2022 Low risk assessment seems to have disappeared from
Purdy's February 11, 2023 FSA Time Credit Assessment (Exhibit A), although the
Warden did again acknowledge its existence in the Response to TRO Motion.  Second,
although the Warden states that Purdy's "first reassessment" was on August 29, 2022
(Dkt. 37 at 11,) Exhibit A contains no mention of any August 29, 2022 risk assessment
(*see* Dkt. 38-1, Resp. Ex. A at 1).  The only risk assessment referenced in Exhibit A is
dated May 3, 2022.  (Dkt. 38-1, Resp. Ex. A at 1.)  According to Exhibit A, the May 3,
2022 Low risk assessment applied to time period number "001," which ran from Purdy's
commitment on March 2, 2022 to August 29, 2022, and to time period number "002,"
which ran from August 29, 2022 to February 25, 2023.  (*Id.*)  Time periods 001 and 002
indicate Purdy was earning FTCs at the 10-day rate.  (*Id.*)

Finally, on April 6, 2023, the Court received Purdy's FSA Time Credit Assessment dated March 25, 2023.  (Dkt. 42-1, Pet. Ex. A at 1.)  The relevant portion of that Assessment is reproduced below:

```
--- FSA Assessment -------------------------------------------------------
 #   Start       Stop        Status        Risk Assignment  Risk Asn Start   Factor
001  03-02-2022  03-30-2022  ACTUAL        FSA R-LW         05-03-2022 1117   10
002  03-30-2022  09-26-2022  ACTUAL        FSA R-LW         05-03-2022 1117   10
003  09-26-2022  12-25-2022  ACTUAL        FSA R-LW         05-03-2022 1117   15
004  12-25-2022  03-25-2023  ACTUAL        FSA R-LW         05-03-2022 1117   15
005  03-25-2023  06-23-2023  ACTUAL        FSA R-LW         02-21-2023 1147   15
```

(*Id.*)

The March 25, 2023 Assessment paints a third and different picture of Purdy's assessments and credits.  (*Compare* Dkt. 22-2, Resp. Ex. B at 1, *with* Dkt. 38-1, Resp. Ex. A at 1, *and* Dkt. 42-1, Pet. Ex. A at 1.)  That document includes the May 3, 2022 Low risk assessment and applies it to time periods 001 (March 2, 2022 to March 30, 2022) and 002 (March 30, 2022 to September 26, 2022), during which Purdy was earning FSA credits at the 10-day rate.  (Dkt. 42-1, Pet. Ex. A at 1.)  But the May 3, 2022 Low assessment is also applied to time periods 003 (September 26, 2022 to December 25, 2022) and 004 (December 25, 2022 to March 25, 2023), during which Purdy was earning FSA credits at the **15-day rate**.  (*See id.*)  The document further indicates that Purdy was again assessed as Low risk on February 21, 2023, and applies that assessment and the 15-day rate to the time period from March 25, 2023 to June 23, 2023.[8]  (*See id.*)

---

[8]   The February 21, 2023 PATTERN assessment took place 294 days after the May 3, 2022 PATTERN assessment, not within the "at least once every 180 days" set forth in Program Statement 5322.13, Inmate Classification and Program Review and which the Warden said the BOP was implementing.  (Dkt. 22-5, Resp. Ex. 1 at 5; *see also* Dkt. 21.)

Under these circumstances, it is difficult for the Court to assess the merits of the parties' arguments as to whether the BOP's interpretation of the statute is correct, what Purdy's earning rate should be, and when it should have changed to the 15-day rate. The Warden's position as to the dates of Purdy's PATTERN risk assessments has changed throughout this litigation and, at times, appears inconsistent with the BOP records. There is also no explanation why Purdy's FSA credit earning rate changed from the 10-day rate to the 15-day rate on September 26, 2022, when the BOP records before the Court do not indicate Purdy underwent a PATTERN risk assignment that prompted the change. In other words, it appears the BOP was relying on the May 3, 2022 PATTERN risk assessment before and after his earning rate increased to the 15-day rate in September 2022. That is inconsistent with the BOP's position as to when the earning rate increases. There is no explanation of why Purdy's March 16, 2022 PATTERN assessment is no longer part of the BOP records. And finally, in the Response to TRO Motion, the Warden states: "Even with the inclusion of the 110 FTCs he has earned as of February 11, 2023, Purdy's projected release date, via an FSA release, is not until February 13, 2024. **Therefore, pursuant to 18 U.S.C. § 3624(g)(1)(A), Purdy is not entitled to have his FTCs applied at this time because the amount of his FTCs does not yet equal the remainder of his term of imprisonment, as required by federal statute.**" (Dkt. 37 at 13 (emphasis added).) But the Second Apple Declaration (filed in support of the Response to TRO Motion) states: "Since my prior declaration in this matter, **Purdy has received additional FSA time credits, for a total of 110 days to be used towards an early release, and is now eligible to apply those time credits assuming he maintains**

28

**his current PATTERN score.**"  (Dkt 38 ¶ 3 (emphasis added) (citing Dkt. 38-1, Resp. Ex. A).)  Absent some explanation from the Warden, the Court cannot square these two statements.[9]

As explained in Section III.C.5.b, the Court's calculations indicate that even if Purdy were entitled to the 15-day rate from the day he was committed to FCI-Sandstone[10], he still does not have a number of FTCs that equals the days remaining in his sentence and therefore is not eligible to have his FTCs applied.  Nevertheless, before the Court makes its determination of whether the BOP's proposed interpretation of 18 U.S.C. § 3632(d)(4)(A)(ii) and the BOP's determination of when Purdy was eligible to begin earning FTCs at the 15-day rate are correct, the Court needs an accurate and reasonably up-to-date statement of Purdy's FSA status, his location, and his projected release date.  *See Flores v. Derr*, No. CV 23-00183 SOM-KJM, 2023 WL 4236183, at *1 (D. Haw. June 28, 2023) ("Section 2241 enables those in custody to 'challenge the

---

[9]     It may be that Purdy's sentence is at the point where the BOP takes earned FTCs into account when planning for his release or transfer to prerelease custody, but those credits are not "applied" to his sentence in some manner because they could be disallowed under certain circumstances.  The Court would appreciate clarification on this point.  The Court would also appreciate clarification as to Purdy's release date, given that the BOP's Public Inmate Locator currently gives a release date of November 5, 2023. *See Find an Inmate*, *available at* https://www.bop.gov/inmateloc/ (last visited July 14, 2023).

[10]     To be clear, the Court rejects Purdy's argument that he was eligible to earn FTCs at the 15-day rate as of his March 2, 2022 commitment because he was assessed a Low PATTERN score during his first assessment.  *See* 18 USC §3632(d)(4)(A); *see also Laksonen v. Eischen*, No. 22-cv-2868 (KMM/JFD), 2023 WL 3072434, at *3 (D. Minn. April 25, 2023) (rejecting argument that 15-day rate should begin being counted "[a]t the point when a person is initially assessed as presenting minimum or low risk of recidivism").  The Court makes this 15-day assumption here as a "worst case" scenario.

29

manner, location, or conditions of [their] sentence's execution.' It is a proper vehicle for

challenging the BOP's calculation of an inmate's statutory release date.") (citations

omitted); *see also Walsh v. Boncher*, Case No. 220cv011197-DLC, --- F. Supp. 3d ----,

2023 WL 363591, at *2 (D. Mass. Jan. 23, 2023) (explaining "a petitioner may challenge

computation of a prisoner's sentence by prison officials via a section 2241 petition"

(quotation marks omitted)); *Keegan v. Derr*, CIV No. 22-00089 LEK-PT, 2023 WL

2403941, at *5 (D. Haw. Mar. 8, 2023) (granting petitioner's petition in part and ordering

the BOP to recalculate petitioner's "earned time credits and to file a declaration regarding

the results of the recalculation") (citing *Stewart v. Snider*, Case No.: 1:22-cv-00294-

MHH-JHE, 2022 WL 2032305, at *7 (N.D. Ala. May 10, 2022) ("Respondent does not

expressly dispute that Stewart has earned additional [Earned Time Credits] between

BOP's last calculation on December 25, 2021, and April 28, 2022, which could result in

an earlier release date. If Stewart has indeed earned additional credits during his time,

then they should be awarded to him and reflected in his sentence. Additionally, because

of the uncertainly of the automated system's implementation and Stewart's approaching

release date, it is necessary for BOP to reevaluate the application of Stewart's credits

. . . ." (citation omitted)), *R. & R. adopted*, 2022 WL 2019965 (June 6, 2022).

As such, the Warden is directed to file and serve on or before July 27, 2023, BOP

records accurately stating Purdy's FSA status, including the dates and scores of all of

Purdy's PATTERN assessments beginning in March 2022, the date Purdy began earning

FTCs at the 15-day rate, and what prompted the change; an explanation of any changes in

the BOP's records; and an explanation for any inconsistencies between the Warden's

statements in this action and the BOP records.  The Warden must also state whether the

BOP is persisting in its interpretation of 18 U.S.C. § 3632(d)(4)(A)(ii) that to earn a total

of 15 days of time credits for every 30 days of programming, an inmate must have their

PATTERN score calculated on three occasions – one "determination" and two

"reassessments" (*see* Dkt. 21 at 16), as the Warden's more recent filings do not appear to

conform to this interpretation.  Purdy may respond to this filing on or before August 10,

2023.  In making this Order, the Court recognizes that the BOP updated its system in

January 2023, and is not suggesting ill intent on the part of the Warden or BOP with

respect to any changes or inconsistencies in their submission to the Court.

### 4.     "18 Months" Policy

Purdy alleges that when he filed his Petition, the BOP had an improper "18

months" policy restricting inmates from applying their FTCs towards early release within

18 months of their projected release dates.  (Dkt. 24 at 2, 7.)  Purdy asserts that if the "18

month" policy was adequately followed, he would have been eligible for placement in a

halfway house as of December 3, 2022, and without application of the "18 months"

policy, in addition to the total FTC days of 270 that he expects to accrue throughout his

sentence, his transfer date to a halfway house would be March 3, 2023.  (*Id.* at 7-8.)

However, Purdy does not provide evidence showing that this "18 months" policy

is in effect or is being applied to him.  In fact, Purdy appears to acknowledge that any

such policy is no longer in effect.  (*See id.* at 7 (admitting that BOP Program Statement

5410.01 does not discuss the "18 months" requirement and that he was informed by the

"Regional Director" on December 1, 2022 that the requirement "no longer stands").)

There is no mention in BOP Program Statement 5410.01 of the alleged "18 months" policy. (*See* Dkt. 22-4, Resp. Ex. D (BOP Program Statement 5410.01).) Accordingly, the Court recommends denial of the Petition insofar as it seeks relief based on the alleged "18 months" policy, as there is no evidence such a policy exists or is being applied to Purdy.

**5.     Immediate Application of FTCs, Due Process, Second Chance Act, and Transfer to an RRC or Home Confinement**

**a.     The Parties' Arguments**

Purdy makes a number of arguments as to why he believes that his FTCs, GCT, and the application of the Second Chance Act entitle him to immediate transfer to an RRC or home confinement. (*See, e.g.*, Dkt. 1-1 at 18-20; Dkt. 24 at 2, 5, 7-8, 10; Dkt. 26 at 2.) These arguments are interrelated, and the Court addresses them together in this Section.

First, Purdy argues that the BOP's implementation of the FSA violates his due process rights and liberty interests. (Dkt. 8 at 2; Dkt. 24 at 2-3; Dkt. 26 at 2.) According to Purdy, "FTCs are very similar to the GCT Time Credits, with the main difference being [that] they stem from different legislation" and all earned and future projected FTCs and GCT credits should be accumulated to determine inmates' prerelease transfer and accurate release dates. (Dkt. 24 at 9-10.) Purdy argues that he has standing to assert this claim and it is ripe for review. (*Id.* at 8-9.)

The Warden contended in the Response that Purdy lacks standing and that his claim for immediate transfer to prerelease custody based on the application of his FTCs

should be dismissed as premature as Purdy (at that time) "only ha[d] 100 days of FTCs, and a projected release date of June 2, 2024." (Dkt. 21 at 13-16.) The Warden asserted that the FSA, specifically 18 U.S.C. § 3632(d)(4)(C), explicitly limits Purdy's ability to apply his FTCs until the number of the time credits he has earned equal the remainder of his term of imprisonment. (*Id.* at 14-15.) Further, according to the Warden, while Purdy "currently has a Low PATTERN Score, his score could increase between now and when his FTCs equal the remainder of his sentence, which would impact his ability to claim the FTCs"; the FTCs he earns could "potentially advance his release date by a maximum of 365 days"; and before he is able to claim his FTCs, Purdy could be subject to disciplinary action which may result in the loss of time credits. (*Id.* at 15.) The Warden repeated his arguments as to the premature nature of Purdy's claims in the Response to TRO Motion (*See* Dkt. 37 at 4-6, 13.)

>    **b.    Analysis**

First, in Section III.C.3.b, the Court has ordered the Warden to provide updated FSA information as to Purdy. However, even if the Court assumed a 15-day rate from Purdy's commitment on March 2, 2022 until the date of this Order and Report and Recommendation, Purdy has not yet reached the point at which he has earned FSA credits "in an amount that is equal to the remainder of [his] imposed term of imprisonment." *See* 18 U.S.C. § 3624(g)(1)(A). Purdy would have earned **at most** around 251 FTCs.[11] Assuming a June 2, 2024 projected release date pursuant to GCT,

---

[11]    Assuming this Order issues on July 17, 2023, Purdy will have been confined at FCI-Sandstone for 502 days. Dividing that by 30 to get an estimate of how many 30-day

there are still 321 days until that release date, and thus, Purdy is simply not eligible for application of his FTCs at this time because the remainder of his term (about 321 days) exceeds his earned FTCs (approximately 251). His Petition, to the extent he seeks application of his FTCs and relief based on that application, is premature, and the Court therefore recommends denial of Purdy's request that the Court immediately apply his FTCs.[12] *See, e.g.*, *Taylor*, 2022 WL 18584395, at *14.

Second, Purdy's due process rights and liberty interests are not violated even though the BOP has not aggregated his FTCs and GCT when projecting his release date. GCT credits and FTCs are not the same thing; they are different types of time credits set up under different statutory schemes. *Compare* 18 U.S.C. § 3624(a)(b) (discussing GCT), *with* 18 U.S.C. § 3624(g) and 18 U.S.C. § 3632 (discussing FSA). There are "two critical differences" between GCT (sometimes referred to as "good-time credits") and FTCs: (1) "good-time credits entitle a prisoner to a reduction in his sentence, period. . . . In contrast to prisoners who earn good-time credits, prisoners who earn [FTCs] may not be able to *apply* those [FTCs]" given contingencies in the FSA; and (2) "unlike good-time credit accumulated under § 3624(b), [FTCs] are not a general entitlement. Instead, prisoners are merely afforded the *opportunity* to earn [FTCs] by participating in recidivism-reduction programming." *Fiorito v. Fikes*, Case No. 22-CV-0749 (PJS/TNL),

---

periods that encompasses results in 16.73. Multiplying that figure by 15 results in 251 FSA credits.

[12]     Purdy also argues that his FTCs should be applied every 30 days. (*See* Dkt. 1-1 at 18-19 ("If FTCs were being applied monthly as they should have been.").) The Court rejects that argument as contrary to the plain language of 18 U.S.C. § 3624(g)(1)(A).

2022 WL 16699472, at *5 (D. Minn. Nov. 3, 2022), *appeal docketed*, No. 23-1006 (8th

Cir. Jan. 3, 2023); *Fiorito v. June,* No. 23-1007 (8th Cir. Jan. 3, 2023); *Fiorito v. Thomas,*

No. 23-1008 (8th Cir. Jan. 3, 2023).

As explained by U.S. Magistrate Judge Dulce J. Foster in *Smith v. Eischen* when

denying the petitioner's request for his FTCs to be included in his statutory term served:

> The flaw with this argument is that unlike Good Conduct Time credits, which
> are reflected in an inmate's projected release date, FSA Time Credits are
> conditional benefits contingent on numerous factors that may result in the
> inmate's inability to apply the FSA Time Credits for an early release. In other
> words, FSA Time Credits are not applied to an inmate's projected release
> date until closer to release because of the possibility conditions might
> change, such that the inmate ultimately will not be entitled to claim them.

> It is well established that federal inmates have a statutorily mandated interest
> in Good Conduct Time credits. *See Wolff v. McDonnell*, 418 U.S. 539, 557
> (1974). This liberty interest exists because the BOP has no discretion to
> award or not award Good Conduct Time credits once the inmate is eligible.
> *See Olim v. Wakinekona*, 461 U.S. 238, 249 (1983) ("[A] State creates a
> protected liberty interest by placing substantive limitations on official
> discretion."); *see also Moorman v. Thalacker*, 83 F.3d 970, 973 (8th Cir.
> 1996) ("[T]o be so considered [a liberty interest], the state must have created
> a mandatory scheme which necessarily affects the duration of a prisoner's
> sentences."). An inmate's constitutional interest in Good Conduct Time
> Credits is reflected in the non-discretionary statutory language used to grant
> those credits. *See* 18 U.S.C. § 3624(a) ("A prisoner *shall* be released by the
> Bureau of Prisons on the date of the expiration of the prisoner's term of
> imprisonment, less any time credited toward the service of the prisoner's
> sentence as provided in subsection (b).") (emphasis added); 28 C.F.R. §
> 523.20(b)(1) ("The Bureau *will* award inmates up to 54 days of G[CT] credit
> for each year of the sentence imposed by the court . . . the Bureau *will* initially
> determine a projected release date by calculating the maximum GCT credit
> possible) (emphasis added); 28 C.F.R. § 523.20(b)(4) ("When the inmate
> reaches the Bureau projected release date, the sentence will be satisfied and
> the inmate will be eligible for release.")

> In contrast, the FSA explicitly limits the BOP's authority to apply FSA Time
> Credits until an inmate meets certain criteria. These limitations include a
> requirement that an inmate's number of earned FSA Time Credits must equal

the remainder of the inmate's term of imprisonment. *See* 18 U.S.C. § 3624(g)(1)(A); *see also* 28 C.F.R. § 523.44(b)-(d). Moreover, unlike Good Conduct Time credits, the FSA clearly establishes that an inmate may lose FSA Time Credits "for violation of the requirements or rules of an EBRR Program or PA." 28 C.F.R. § 523.43(a). **Stated more simply, Good Conduct Time credits, once earned, cannot be taken away for bad behavior; FSA Time Credits can. For these reasons, unlike Good Conduct Time credits, FSA Time Credits are not a general entitlement and the mere opportunity to earn credit toward the satisfaction of a sentence does not create a protected liberty interest**.

Case No. 22-cv-1704 (NEB/DJF), 2023 WL 3170436, at *5 (D. Minn. May 1, 2023) (footnote omitted) (emphasis added). Accordingly, the Court recommends denial of the Petition to the extent Purdy claims that his due process rights and liberty interests are violated because the BOP will not aggregate his earned and projected FTCs and GCT credits at this time to produce a projected release date and make release or transfer determinations based on that date.

Third, Purdy seeks inclusion of his Second Chance Act "halfway house" time when projecting his release date. (*See, e.g.*, Dkt. 24 at 2 ("For the minimum RRC/HC time (6 months) see Purdy's Home Detention Eligibility Date (RRC/HC) that is 6 months away from the projected GCT release date in ECF No. 22-1, Exhibit A, Page 2 of 3, the date adjusts as the release date adjusts for FTC's [sic].").) Purdy argues that placement in a halfway house implicates a liberty interest. (*Id.* at 2-3. (citing *Silva v. Paul*, No. 18-CV-2177 (ECT/ECW), 2019 WL 542945, at *5 (D. Minn. Jan. 7, 2019).)

In his Response to TRO Motion, the Warden states that Purdy's "Unit Team reviewed him for a pre-release placement in an RRC or home confinement under the Second Chance Act and recommended that Purdy be placed in an RRC for 90 days."

(Dkt. 37 at 5 (citing Dkt. 38 ¶ 12 and Dkt. 38-3, Resp. Ex. C).)  The Unit Team "determined a 90-day placement in an RRC would be sufficient to allow [Purdy] the opportunity to establish employment, establish an independent residence, and successfully reintegrate into the community," and that recommendation "was referred to the Minneapolis RRM's office to be finalized after consideration of the § 3621(b)(1) resources of the facility factor."  (*Id.* (citing Dkt. 38 ¶¶ 13-14; Dkt. 38-4, Resp. Ex. D).)  As of the RRM's decision, "Purdy's release date had been advanced to February 13, 2024, with the application of his FSA time credits," and "the RRM's office selected a pre-release RRC placement date of November 16, 2023."  (Dkt. 38 ¶14.)  The Warden also argues that the BOP's determination that Purdy should not be transferred to an RRC until November 16, 2023 "cannot be judicially reviewed."  (Dkt. 37 at 6.)

The Court turns to Purdy's argument that halfway house placement or the Second Chance Act's reentry language implicates a liberty interest.  *Silva*, which Purdy relies on, involved whether a prisoner could challenge "placement and transfer determinations pursuant to § 3621(b) and § 3624(c) under § 2241."  2019 WL 542945, at *5, *R. & R. adopted*, No. 18-CV-2177 (ECT/ECW), 2019 WL 536668 (D. Minn. Feb. 11, 2019).  It did not hold that inmates have a liberty interest in halfway house placement.  On the contrary, the law is clear that Purdy has no protected liberty interest in serving his sentence at a particular institution, whether in a secure correctional facility, prison camp, RRC, or home confinement.  *See Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The Constitution does not require that the State have more than one prison for convicted felons; nor does it guarantee that the convicted prisoner will be placed in any particular

prison, if, as is likely, the State has more than one correctional institution. . . . Neither, in our view, does the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system."); *see also Mahfouz v. Lockhart*, 826 F.2d 791, 792 (8th Cir. 1987) (holding that an inmate has no constitutionally protected right or liberty interest in being transferred to a release program).

It is unclear whether Purdy is challenging the BOP's determination that 90 days in an RRC is appropriate.  In any event, the record demonstrates that Purdy received an individualized review under the factors enumerated in the Second Chance Act.  (*See* Dkt. 38 ¶¶ 12-14; Dkt. 38-3, Resp. Ex. C; Dkt. 38-4, Resp. Ex. D.)  Based on the record, there was no violation of that statute.  *See Miller v. Whitehead*, 527 F.3d 752, 758 (8th Cir. 2008) ("[T]he statute does not require the BOP to provide prisoners with a detailed statutory analysis whenever a prisoner requests an immediate transfer to an RRC.  In *Fults*, we affirmed a district court order that simply required the BOP to consider such a request 'in good faith.'  We see no evidence that the warden acted other than in good faith when he concluded that immediate RRC placement was not appropriate.") (citation omitted); *see also Raymer v. Cruz*, No. CIV 08-6382 MJD/JJG, 2009 WL 2778073, at *1 (D. Minn. Aug. 28, 2009) ("The Court agrees that Raymer is not entitled to any particular period of halfway house or home confinement period under the Second Chance Act. Rather, the BOP must simply consider a prisoner's request for a halfway house transfer

'in good faith' and in accordance with the factors in 18 U.S.C. § 3621(b).") (citing *Miller*, 527 F.3d at 758).

Further, because Purdy seeks an order requiring the BOP to transfer him to an RRC or home confinement under several different theories, the Court clarifies the limitations on the Court's authority to do so. The Court has explained above why Purdy's individual arguments fail. But more importantly, "the BOP has exclusive authority to determine the placement of prisoners. Neither the CARES Act nor the FSA alters this authority." *United States v. Vang*, Crim. No. 16-277 (DWF/KMM), 2020 WL 4704875, at *2 (D. Minn. Aug. 13, 2020)) (collecting cases). "Nothing in the statutes amended by the FSA permits the Court to place Defendant in home confinement. Under the FSA, the authority to place a prisoner remains with the BOP." *United States v. Kluge*, Crim. No. 17-61 (DWF), 2020 WL 209287, at *3 (D. Minn. Jan. 14, 2020). The Court simply does not have the authority here to order the BOP to transfer Purdy to any facility. The Court recommends that the Petition be denied insofar as Purdy seeks transfer to an RRC or home confinement.

\* \* \*

For all of these reasons, the Court recommends that the Petition be denied except insofar as Purdy seeks relief based on when the BOP began calculating his FTCs using the 15-day rate. The Court will address that remaining aspect of the Petition after it receives updated FSA records for Purdy along with the Warden's explanation of the inconsistencies and changes identified in Section III.C.3.b.

**D.     Preliminary Injunction Motion and TRO Motion**

Purdy seeks essentially the same relief in the Preliminary Injunction Motion (Dkt. 8) and the TRO Motion (Dkt. 26) as he sought in Ground Two of the Petition—that is, for his FTCs to be calculated and applied in the manner he proposes and his immediate transfer to prerelease custody.[13]   The Warden opposes both motions on the same grounds that it opposed the Petition.  (*See* Dkts. 21, 37.)

When determining if a party is entitled to a TRO, a court considers: (1) the likelihood of success on the merits of the movant's claims; (2) the threat of irreparable harm to movant; (3) the balance between that threat of harm and the injury that granting injunctive relief would inflict on other interested parties; and (4) whether the issuance of a TRO is in the public interest.  *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  The same factors are considered for a motion for preliminary injunction.  *See S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 709 (8th Cir. 1989); *Jackson v. Nat'l Football League*, 802 F. Supp. 226, 229 (D. Minn. 1992).  Where, as here, "a defendant has received notice and had an opportunity to respond to a motion for a TRO, the motion will be construed as one for a preliminary injunction."  *Stabnow v. Lourey*, Case No. 19-cv-1664 (NEB/HB), 2019 WL 5150155, at *1 (D. Minn. July 23, 2019), *R.&R. adopted sub nom*. 2019 WL 4201071 (D. Minn. Sept. 5, 2019) (citing *Carlson v. City of Duluth*, 958 F. Supp. 2d 1040, 1052 n.1 (D. Minn.

---

[13]     Federal Rule of Civil Procedure 65 authorizes a district court to grant injunctive relief in the form of either a TRO or a preliminary injunction.

2013)).  No single factor is determinative, and all factors must be viewed in totality when a court decides if relief should be granted.  *Dataphase Sys.*, 640 F.2d at 113. Because "a preliminary injunction is an extraordinary and drastic remedy, one [ ] should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation and emphasis omitted); *Mgmt. Registry, Inc. v. A.W. Co., Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2019) ("The party seeking injunctive relief bears the burden of proving that these factors weigh in its favor.") (cleaned up).

Here, the Court recommends denial of the Preliminary Injunction Motion and TRO Motion.  First and foremost, for the reasons stated in Section III.C.5.b, Purdy is not likely to succeed on the overwhelming majority of Ground Two (the substantive ground) of his Petition and is not likely to succeed in obtaining an order for his immediate transfer to an RRC or home confinement.

Further, as to irreparable harm, the Court concludes that Purdy has not made a clear showing that he is likely to suffer irreparable harm in the absence of injunctive relief.  As discussed in Section III.C.5.b, Purdy has not yet reached the point at which he has earned FTCs "in an amount that is equal to the remainder of [his] imposed term of imprisonment."  *See* 18 U.S.C. 3624(g)(1)(A).  In other words, Purdy is not yet at risk of remaining in prison when he should have been transferred to an RRC or home confinement based on inconsistencies in the BOP's calculation of his FTCs or the BOP's interpretation of § 3632(d)(4)(A)(ii).

Finally, Purdy has not shown that the public interest favors the injunctive relief he seeks (his immediate release to an RRC or home confinement), and the Court concludes that the balance of the harms does not favor an injunction. The Court therefore recommends denial of the Preliminary Injunction Motion and TRO Motion.

## E.    Evidentiary Hearing

At this time, the Court does not believe an evidentiary hearing is necessary. However, the Court will determine if an evidentiary hearing is necessary as to Purdy's earning rate claim after it receives the updated FSA records and other documents from the Warden.

## IV.    ORDER

Based on the above, and on the files, records, and proceedings herein, **IT IS ORDERED that**:

1. Jeffrey Colin Purdy's Motion to Expand the Record/Affidavit in Support (Dkt. 31) is **GRANTED**.

2. On or before July 27, 2023, the Warden must file and serve BOP records accurately stating Purdy's FSA status, including the dates and scores of all of Purdy's PATTERN assessments beginning in March 2022, the date Purdy began earning FTCs at the 15-day rate, and what prompted the change; an explanation of any changes in the BOP's records; and an explanation for any inconsistencies between the Warden's statements in this action and the BOP records. The Warden must also state whether the BOP is persisting in its interpretation of 18 U.S.C. § 3632(d)(4)(A)(ii) that to earn a total of 15 days of time credits for every 30 days of

programming, an inmate must have their PATTERN score calculated on three occasions – one "determination" and two "reassessments." Purdy may respond to this filing on or before August 10, 2023.

## V.    RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein, **IT IS RECOMMENDED that**:

1. Jeffrey Colin Purdy's Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241 (Dkt. 1) be **DENIED** except insofar as he asserts a claim based on his earning rate for FTCs;

2. Jeffrey Colin Purdy's Emergency Motion for Preliminary Injunction/Affidavit in Support (Dkt. 8) be **DENIED**; and

3. Jeffrey Colin Purdy's Emergency Motion for Temporary Restraining Order/Affidavit in Support (Dkt. 26) be **DENIED**.

Dated: July 17, 2023                    *s/Elizabeth Cowan Wright*
                                        ELIZABETH COWAN WRIGHT
                                        United States Magistrate Judge

### NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D.

Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).